## Abrams v. C. Schmidt & Sons, Inc., Appellant.

Argued October 10, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADT-FELD, PARKER, RHODES and HIRT, JJ.

*John J. Gallagher,* for appellant.

*Leonard J. Schwartz,* with him *Fox, Rothschild, O'Brien & Frankel,* for appellee.

OPINION BY STADTFELD, J., January 30, 1941:

The plaintiff, appellee in this case, brought suit in assumpsit against the defendant corporation to recover damages for breach of contract alleging that the defendant had agreed to sell to the plaintiff 3,000 cases of beer f. o. b. Philadelphia, shipment to be made immediately after midnight, April 7, 1933.

The defendant pleaded that the contract was for delivery within ten days after April 7, 1933; that on April 10, 1933 the defendant cancelled the contract; and that the $7200 representing the purchase price of the beer was then returned to the plaintiff.

On March 27, 1933, the plaintiff called at the office of the defendant corporation in Philadelphia and spoke to C. A. Zoller who was at the time the manager of the defendant corporation. The plaintiff stated that his company, having been engaged in the malt syrup business during prohibition in Providence, Rhode Island, was familiar with practically all the wholesale beverage dealers in New England.

After some discussion, Zoller, on behalf of the defendant, agreed to ship 5,000 cases at $1.40 per case content, and $1.00 deposit for racks and bottles, f. o. b. Philadelphia, to be loaded on railroad cars immediately after midnight, April 7, 1933. The plaintiff deposited $5,000 on account of the purchase price. On April 5, 1933, Zoller telephoned to the plaintiff and informed

him he could only ship 3,000 cases, and asked that the balance of the purchase price, namely, $2,200 be forwarded. The $2,200 was mailed by the plaintiff on April 5, 1933. Zoller assured the plaintiff that he had some cars rolled up alongside the building and 80,000 cases on hand and all he had to do was to roll them out on Monday after midnight. Zoller agreed to ship the beer on a freight train known as the Speedwich, which would leave shortly after midnight, April 7th.

When the shipment did not arrive in Providence on the 8th, the plaintiff sent three telegrams demanding delivery. The defendant replied by wire, stating that the demand on them was beyond all expectations and that everything was being done to facilitate the plaintiff's shipment. When shipment was not received during Saturday, April 8th, or on Sunday, April 9th, the plaintiff came to Philadelphia on Monday, the 10th. Zoller then informed the plaintiff that his company was unable to deliver the beer purchased and stated that their entire stock had been sold out. He promised shipment in small quantities, however, beginning Wednesday, April 12th, by truck, and insisted that the plaintiff take back the purchase money of $7,200 and pay for each truck load c. o. d.

After leaving the defendant's brewery on April 10th, plaintiff called each of the breweries in Philadelphia by telephone in an effort to purchase the necessary quantity of beer. All the breweries refused to sell beer for shipment outside of the Philadelphia area. Only one brewery extended such encouragement as to warrant a personal call, but the plaintiff was unable to obtain any beer whatever for shipment to Providence.

The plaintiff then went to New York and spent Tuesday and Wednesday in New York and Newark and contacted every brewer he could find there in an effort to purchase the 3,000 cases of beer, but was unsuccessful in making such purchase; he found that it was their

uniform policy to provide for local markets first. There were no breweries in and around Providence.

On Tuesday, April 11th, the plaintiff spoke to Zoller over the telephone from Newark and informed him of the efforts he was making to purchase the beer and of his lack of success and demanded that truck load shipments begin on Wednesday as Zoller had promised. Zoller, however, stated that he could not make the shipments on Wednesday or at any other definite time. In reply to a telegram on Wednesday, April 12th, the plaintiff was again informed that the beer could not be shipped on that day as promised, nor could any other day for shipment be given.

When it became apparent that the 3,000 cases of beer could not be obtained by the plaintiff from any brewery, the plaintiff, with the aid of an employee, diligently endeavored to acquire beer in odd lots from dealers and wholesale distributors in New York and Newark. Five weeks were spent, with the aid of the employee, in acquiring the 3,000 cases of beer. The difference between the contract price and the price which the plaintiff was obliged to pay for the beer was $1,230 and the extra freight charges were $270, totaling $1,500.

The case was tried before SMITH, J., on October 9, 1939, with a jury. The case was submitted to the jury in a fair and comprehensive charge to which no exception was taken. The verdict was in favor of the plaintiff for the aforesaid sum of $1,500.

Motion for new trial and motion for judgment n. o. v. were dismissed by the court en banc on January 16, 1940, in an opinion by ALESSANDRONI, J., and judgment entered on the verdict, January 22, 1940. This appeal followed.

The verdict of the jury establishes the following facts: 1. The existence of a contract between the plaintiff and defendant under the terms of which, the defendant agreed to sell and ship to the plaintiff 3,000 cases of

beer after midnight, April 7, 1933, f. o. b. Philadelphia at the price of $1.40 per case content. 2. That the defendant violated the terms of the agreement by refusing to make shipment in accordance with the terms of the agreement. 3. That there was no market available to the plaintiff in Philadelphia where 3,000 cases of beer could be purchased for shipment to Providence, Rhode Island, at the time of the breach. 4. That the plaintiff finally succeeded, between April 13 and May 16, 1933, in acquiring 3,000 cases of beer in New York, the nearest market, at an average price of $1.81 per case content, which was 41¢ higher than the contract price per case content; and that the transportation cost was 9¢ higher per case than the carload transportation cost from Philadelphia.

The defendant contends that the plaintiff has no right to recover as damages the higher price which he was obliged to pay in order to acquire the 3,000 cases of beer, and that any damages which the plaintiff might be entitled to recover were limited to the difference between the contract price and the market price of beer in Philadelphia at the time of the breach.

The plaintiff, however, showed that there was no market in Philadelphia on April 7th or shortly thereafter, in which he could purchase the 3,000 cases of beer. The trial judge was painstakingly careful to charge the jury on the question: "Was there a market for beer at the time in the City of Philadelphia? If there was, and if you find that there was a breach of this contract, there was a duty upon the plaintiff to go out into the market in Philadelphia and buy beer at the market price and the damage would be the difference between the contract price and the market value. But suppose there was no market in Philadelphia, then it was his duty to go to the nearest available market and buy beer at the most reasonable price in that market."

We quote from the opinion by ALESSANDRONI, J.: "It

was not denied that it was the policy of brewers to prefer the local market nor was it denied that the demand immediately following repeal was beyond expectation. The chaotic situation described by Zoller which existed at the brewery of the defendant corporation was very illuminating and strong corroborative evidence of the plaintiff's testimony that he was unable to acquire beer directly from the brewers. ...... The verdict of the jury not only establishes that there was an existing contract, despite the defendant's claim of rescission and that the defendant was guilty of a breach of its agreement by failing to deliver, but also that there was no market available to the plaintiff in Philadelphia at the breweries for 3,000 cases of beer for shipment to Providence. This was a question of fact. The testimony of the plaintiff corroborated by that of Zoller and the existing conditions described, as well as the inability of the defendant to make shipment because of local demands was sufficient, if believed; *Popkin Bros. v. Dunlap,* 130 Pa. Super. 50. A market cannot be considered available unless the plaintiff could satisfy his wants therein and this issue was manifestly one that the jury alone could consider: *Mindlin v. O'Boyle,* 278 Pa. 212."

A careful examination of the record convinces us that the evidence fully supports the verdict.

Ordinarily, the measure of damages would be the difference between the contract price and the market price maintained by brewers in Philadelphia at the time of the breach. This would be so because the plaintiff presumably could supply himself with 3,000 cases of beer in the event of the breach of contract by the defendant. However, since there was no market in which the plaintiff could possibly supply himself with the beer, the measure of damages would be the difference between the contract price and the higher price the plaintiff was compelled to pay for the beer.

In *McHose v. Fulmer,* 73 Pa. 365, 367, Mr. Justice

SHARSWOOD declared: "When a vendor fails to comply with his contract, the general rule for the measure of damages undoubtedly is, the difference between the contract and the market price of the article at the time of the breach. This is for the evident reason that the vendee can go into the market and obtain the article contracted for at that price. But when the circumstances of the case are such that the vendee cannot thus supply himself the rule does not apply, for the reason of it ceases: *Bank of Montgomery v. Reese,* 2 Casey 143. 'It is manifest,' says Mr. Chief Justice LEWIS, 'that this (the ordinary measure) would not remunerate him when the article could not be obtained elsewhere.' If an article of the same quality cannot be procured in the market, its market price cannot be ascertained, and we are without the necessary *data* for the application of the general rule." See also, *Theiss v. Weiss,* 166 Pa. 9, 31 A. 63.

The Sales Act of May 19, 1915, P. L. 543, Sec. 67 (69 PS §312) provides: "Second. The measure of damages *is the loss directly and naturally resulting in the ordinary course of events from the seller's breach of contract.* Third. Where there is an *available market for the goods* in question, the measure of damages, in the absence of special circumstances showing proximate damages of a greater amount, is the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered, or, if no time was fixed, then at the time of the refusal to deliver." (Italics supplied).

In the *Grant Tower Mining & Mfg. Co. v. Phillips et al.,* 90 U. S. 471, 23 Law. Ed. p. 71, the United States Supreme Court permitted the plaintiff to recover increased transportation costs as well as the price paid. "The true rule would seem to be, to allow the plaintiffs to show the price they would have had to pay for coal in the quantities which they were entitled to receive it

under the contract at the nearest available market where it could have been obtained. The difference between such price and the price stipulated for by their contract, with the addition of the increased expense of of transportation and hauling (if any), would be the true measure of damages. To this is properly to be added the claim (if any) for keeping boats and barges ready at Grand Tower for the receipt of coal."

Appellant contends that the expenses of the plaintiff's employee in purchasing the beer was not a proper item of damage since such damage was not within the contemplation of the parties. It is evident that the jury did not include these expenses in their verdict which was limited to the increased cost of the product and the increased cost of transportation. It is not necessary to discuss this item as the evidence did the defendant no harm.

Appellant contends that the trial judge erred in admitting in evidence, invoices showing purchases of beer made by General Distributing Company. The plaintiff testified that he paid for the 3,000 cases of beer out of his own funds and that the employee who aided him in purchasing the beer was his personal employee. The beer, however, was billed to the General Distributing Company, at the plaintiff's direction, he being the sole stockholder of the company. Since the plaintiff himself paid for the beer and paid the expenses incurred in acquiring the beer, his testimony of the price paid was admissible in evidence in order to show the damage he sustained.

After a careful examination of the entire record, we are satisfied that the case was ably tried and fairly submitted, and that the case was properly disposed of by the court below.

Judgment affirmed.