390 A.2d 252

**Peter DENBY and Peggy Denby, his wife, Appellees,**

v.

**NORTH SIDE CARPET CLEANING COMPANY, Appellant.**

Superior Court of Pennsylvania.

Argued April 18, 1978.

Decided July 12, 1978.

Robert Rade Stone, Pittsburgh, for appellant.

James H. McConomy, Pittsburgh, with him Reed, Smith, Shaw & McClay, Pittsburgh, for appellees.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

HOFFMAN, Judge:

Appellant contends that [1] the lower court's verdict is against the weight of the evidence and [2] the lower court erred in its calculation of damages. We agree with the latter contention and, for the reasons which follow, remand for proceedings consistent with this opinion.

On September 19, 1974, appellees filed a complaint in trespass and assumpsit in the Allegheny County Court of Common Pleas against appellant, a carpet cleaning estab-

lishment in Pittsburgh. In the complaint, appellees averred that in March of 1974, they delivered certain household wool carpeting to appellant for cleaning. According to appellees, they entrusted the carpets to appellant in reliance on its oral representation that the cleaning process would not cause the carpets to shrink. When appellant returned the carpets after cleaning, appellees discovered that they had shrunk. Because the carpets no longer fit the room dimensions to which they were individually cut, appellees alleged that appellant had rendered their carpets useless. Appellees requested damages of $6500, the cost of new carpeting of equal quality and utility. On December 3, 1975, a panel of arbitrators awarded appellees $2839.29. Appellant filed an appeal to the court below, and on June 4, 1976, a non-jury trial commenced.

Appellee Peter Denby testified that the carpets in question covered the living room, dining room, and front hall. He and his wife, appellee Peggy Denby, had ordered the imported wool carpets in 1970 specially to fit the dimensions of the rooms. After appellant cleaned the carpets "all the rugs were [grossly deformed] except the front hall which was merely shrunk. The living room and dining room each had fireplaces, the rug was cut to fit the hearths. It came no where near the hearths when it was returned . . .. The living room rug was shrunk by as much as two feet lengthwise and all distorted, the corners were rounded rather than square, nothing fit at all."

After being notified of appellees' dissatisfaction, appellant took back the carpets in order to resize or stretch them to their original size. Appellee Peter Denby testified that "they still didn't fit. This time they had rows of nails—nail holes down all the edges. In places the welting was bent way underneath. . . . [T]hey had sewed a piece of cloth along the edge of the rug when they cut it and it was all deformed. Still round corners where there should have been squares, still not fitting. And the rugs themselves have lost all resilience, the quality of the wool in springiness and feel. . . . It looks terrible and worse after the first stretching than had been when it was first returned."

Appellee Peggy Denby testified as follows:

"Q: Did you rely on that company to clean your carpet properly?

"A: Yes, and I told them it had never been cleaned before, I wanted it blocked, it was all wool imported from Belgium and I wanted it blocked. There was no discussion on the telephone about shrinkage. I didn't say shrink, I just said I wanted it blocked. They assured me it could be done.

.   .   .

"Q: Did anyone from North Side tell you your carpet would shrink?

"A: No, sir.

"Q: Did anyone from North Side tell you it was inevitable that carpet of this type shrinks?

"A: No, sir."

Ms. Denby then testified that on the day before trial, more than two years after the original cleaning and resizing, appellant's representatives came to her home and offered to remove the carpets and attempt once again to resize them to their original dimensions. "He said that he would fix it but we noticed the backing had been broken, the rug no longer had the resiliency which it had. Further stretching would just make it worse. And Mr. Purnell [appellees' interior decorator] said don't let it go out, you can't clean a rug three times in six months. It will take 20 months out of the life of it, and it is a mess anyway. . . ." Appellee refused to allow appellant's agents to remove the carpet. She also stated that she has kept the damaged carpets on the floor since their cleaning and did not make any effort to replace them because she and her husband awaited the outcome of the instant action.

Finally, appellees called Verner Purnell, their interior decorator, who testified that following the cleaning and stretching "the life of the carpet had been pulled out, stretched out and it still didn't satisfy the measurements that were originally determined upon by the carpet [sic], and the texture of the carpet had deteriorated in the stretching.

. . . [i]t wasn't at all usable, it wasn't at all like the original." The balance of Purnell's testimony focused on the precise dimensions of the rooms, the original cost of the carpeting in 1970, and the estimated replacement cost in 1975 for new carpets of similar quality. He also stated that while carpet depreciates, he was unable to estimate how much appellees' carpets had depreciated in the four year period prior to the time appellant cleaned them. Further, he was unable to estimate the salvage value of the carpets.

On rebuttal,[1] Boyd Sprague, appellant's plant manager, denied that anyone representing appellant guaranteed that the wool carpet would not shrink. To the contrary, he testified that he personally told Ms. Denby that the carpet would shrink and, according to its announced policy, that appellant did not block carpets.

Michael Perzak, a carpet contractor, next testified that on the day before trial, he visited appellees' home, at appellant's request. He stated that because the shrinkage in the carpets was minor and easily remedied, he offered to take them to his business premises and resize them free of charge. Ms. Denby rejected the offer.[2]

On October 4, 1976, the lower court entered judgment for appellees in the amount of $3080.17. This appeal followed.

Appellant first contends that the lower court's verdict is against the weight of the evidence. In *Burrell v. Philadelphia Electric Co.*, 438 Pa. 286, 288–289, 265 A.2d 516, 517 (1970), the Supreme Court stated:

"We have frequently set forth the standards governing the grant of a new trial on the ground that the verdict was against the weight of the evidence. 'The grant of a new trial is within the sound discretion of the trial judge, who is present at the offering of all relevant testimony, but that

1. The balance of the trial took place on October 4, 1976, four months after the initial day of testimony on June 4, 1976, at which appellees presented their case in chief. No reason is given for the hiatus.

2. Walter Werner, Jr., an expert in carpet cleaning and servicing, accompanied Perzak and corroborated Perzak's testimony as to the condition of the carpet after cleaning.

discretion is not absolute; this Court will review the action of the court below and will reverse if it determines that it acted capriciously or palpably abused its discretion.' *Austin v. Ridge*, 435 Pa. 1, 4, 255 A.2d 123, 124 (1969) and cases there cited. 'A new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion: [citation omitted]. Neither should it ordinarily be granted on the ground that the verdict was against the weight of the evidence where the evidence is conflicting and the jury might have found for either party.' *Carroll v. Pittsburgh*, 368 Pa. 436, 445–6, 84 A.2d 505, 509 (1951). A new trial should be awarded on the ground that the verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. *Jones v. Williams*, 358 Pa. 559, 564, 58 A.2d 57; *Carroll v. Pittsburgh,* supra, 368 Pa. at 447, 84 A.2d 505; *Brown v. McLean Trucking Co.*, 434 Pa. 427, 429–30, 256 A.2d 606 (1969)." *See also Musser v. Shenk*, 192 Pa.Super. 471, 161 A.2d 628 (1960).

■ Moreover, the findings of a trial judge sitting without a jury carry the same weight as a jury verdict. *Floravit v. Kronenwetter*, 255 Pa.Super. 581, 389 A.2d 130 (1978).

In the instant case, the lower court found that, despite appellees' request that appellant block the carpet in order to prevent shrinkage, appellant cleaned the carpets in a manner which caused them to shrink. To support this finding, the lower court referred to photographs of the carpets after cleaning which showed that the carpets had shrunk significantly in relation to the dimensions of the rooms to which they were originally fitted. Moreover, the court also noted that appellant's attempt to resize the carpets a week after the initial cleaning resulted in further damage to the appearance and resiliency of the carpets.

■ Our review of the trial record convinces us that the lower court did not act capriciously or palpably abuse its

discretion in finding for appellees on the issue of liability.[3]
*Burrell v. Philadelphia Electric Co.*, supra; *Floravit v. Kronenwetter*, supra. Consequently, we will not disturb the court's conclusion as to liability.

■ Appellant next contends that the lower court erred in calculating damages. Before we can evaluate this assertion, we must make a preliminary observation. The lower court found that the shrinkage and related damage to the carpets rendered them useless as wool pile floor coverings custom-fitted to accommodate the precise dimensions of appellees' home. Our review of the record reveals competent evidence to support this finding. Therefore, in determining the issue of damages, we will assume that the carpets were a total loss, with no possibility of repair or restoration.

In assessing an award of damages, we must first determine a standard against which to measure the award. In the instant case, because appellees captioned their complaint in trespass and assumpsit[4] and failed to delineate the causes of action into separate counts, this determination entails a degree of conceptual ambiguity. Further, it is unclear from the lower court opinion whether the court awarded damages on the basis of a tort or contract theory. However, this uncertainty will not prevent our assessment of the lower court's award if we can determine that the measure of damages would yield the same amount of recovery in both tort and contract.

The Comment to § 901 of the Restatement (First) of Torts (1939), states the general principle governing the valuation of damages in tort: ". . . [T]he law of torts attempts

3. The testimony of appellant's witnesses that the carpets did not shrink or suffer in any way as the result of the cleaning does not alter our conclusion. *Carroll v. Pittsburgh*, supra.

4. Rule 1020(d)(1) of the Pennsylvania Rules of Civil Procedure, 42 Pa.C.S., authorizes and makes mandatory the joinder of causes of action in assumpsit and trespass in separate counts of the same complaint if the causes of action arose out of the same transaction or occurrence or series of transactions or occurrences. *See also* 2 Goodrich-Amram 2d, Procedural Rules Service With Forms, § 1020(d): 1 at 191; 5 Corbin on Contracts § 1019, p. 116 (1964).

primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort." Section 927 of the Restatement applies this general principle to the conversion or destruction of, *inter alia*, personal property: "Where a person is entitled to a judgment for the conversion of a chattel or the destruction of any legally protected interest in land or other thing, the damages include (a) the exchange value of the subject matter or the plaintiff's interest therein *at the time and place of the conversion or destruction*, or a different value where that is necessary to give just compensation. . . ." (emphasis added). The Comment "d" to this clause states that "the owner of a chattel . . . is entitled to obtain as damages in an action of tort against a person who took it an amount at least equal to its exchange value or its value to him at the time it was first tortiously taken."[5] Therefore, according to the Restatement of Torts, damages are to be calculated according to the value of the chattel at the time of the tortious act.

The principle governing recovery in a contract action is that: "[t]he measure of recovery and the method of valuation that are adopted should in every case be so adjusted as to attain as nearly as possible the purpose of our system of remedial justice. This purpose is to put the injured party in as good a position as the promised performance would have put him. . . ." 5 Corbin on Contracts § 1005 (1964). *See also* Dobbs, Remedies § 12.1 (1973); 11 Williston on Contracts § 1338 (3d ed. 1968); Restatement (First) of Contracts § 329, comment "a" at 504 (1932).

5. The confusion engendered by clause (a) led the drafters of the Restatement to propose the following language:

"(1) When one is entitled to a judgment for the conversion of a chattel or the destruction of any legally protected interest in land or other thing, he may recover . . .

(a) the value of the subject matter or of the plaintiff's interest in it *at the time and place of the conversion or destruction*. . . ." (Emphasis added). Restatement (Second) of Torts, § 927 (Tent. Draft No. 19, 1973).

This proposed revision states without ambiguity that tort damages are to be measured by the value of the chattel at the time of the tortious act.

We must now determine whether these two measures of recovery, when applied to the instant case, would yield the same computation of damages. The amount of recovery in tort would be measured by the value of the carpets in March, 1974, the time of their destruction by appellant. To reach an accurate figure, a court would have to value the carpets according to their age and condition. That assessment would be altered by, among other variables, an appropriate factor for post-cleaning salvage value.

The purpose of recovery in contract is to place the injured party in as good a position as if performance had been rendered. In the instant case, had appellant performed as promised, it would have returned three cleaned carpets to appellees. To place a value on the loss suffered by appellees as a result of appellant's failure to perform, a court would have to assess the value of the carpets at the time of the cleaning. Once again, the court would consider their age, condition, and salvage value.

Therefore, it is evident that the measure of damages in both trespass and assumpsit would yield the same valuation; the computation would consist of ascertaining the value of appellees' carpets at the time of the cleaning. We must now, on the record before us, apply this measure of damages and construct the broad parameters of a proper damage award and compare our assessment with that of the lower court in order to determine if the court correctly computed the amount of recovery.

In the instant case, appellees' interior decorator who sold the carpets to them testified that the living room and dining room carpets cost $1726.96 when purchased in 1970.[6] The testimony as to the cost of the hallway carpet in 1970 was confused. However, the decorator stated that the hallway carpet represented one-fifth of the area of the hallway and stair carpeting which, in 1970, cost approximately $1320. Therefore, according to appellees' decorator,

6. Because appellant did not remove the padding from appellees' home when it cleaned the carpets, the lower court did not consider the costs of the padding when calculating damages.

the purchase price of the hallway carpet in 1970 was $264.00. When this figure is added to the 1970 price of the living room and dining room carpets, it yields a total price in 1970 of $1990.96 for the three pieces of carpeting in question.

Appellees' decorator could not estimate the amount of depreciation in the four-year period prior to the time appellant cleaned the carpets. However, Walter Werner, a carpet inspector and consultant for more than 20 years, testified for appellant that, according to the Gray Guide, a carpet industry reference source, carpet of the quality owned by appellees would depreciate 60% over four years. On cross-examination, appellees did not introduce a different standard for measuring depreciation. Therefore, according to appellant's expert, the depreciated value of appellees' four year old carpets at the time of the cleaning was $796.38 or 40% of $1990.96, their purchase price in 1970.

Consequently, on the evidence adduced at trial, appellees, at most, were entitled to recover approximately $1990.96, the 1970 purchase price; at least, they were entitled to $796.38, the depreciated value of the carpets, according to figures presented by appellant's expert.[7] Instead, the lower court assessed damages at $3080.17. In so doing, the court must have introduced a variable in its calculations not cognizable under the proper measure of damages in tort and contract. Indeed, in its opinion, the court stated: "The evidence reveals the original costs of the carpeting, *the replacement costs* and various depreciation methods utilized in evaluating carpets which had been in use for a number of years. The Court had adequate evidence to support the judgment." (Emphasis added). It appears clear from the court's statement and from the detailed evidence adduced at trial as to the 1975 cost of new carpeting that the court

7. We acknowledge that these figures are only approximations because of the uncertainty in the record as to the original cost of the hallway carpet. Also, the minimum figure would be adjusted to reflect salvage value. Further, there was no calculation of the effect of certain pre-cleaning brass polish stains on the value of the carpet. Moreover, our calculations do not take installation costs into consideration.

utilized the replacement cost of new carpeting in addition to the carpets' 1974 adjusted value in its assessment of damages. To interject this variable was error. Because the court applied an incorrect standard in measuring the amount of recovery, the damage award cannot be sustained.[8] *Jenkins v. Pennsylvania R. R. Co.*, 220 Pa.Super. 455, 460, 289 A.2d 166, 168 (1972).

The appellate courts of Pennsylvania have confronted cases in which the lower court correctly decided the issue of liability, but erred in its assessment of damages. *Troncatti v. Smereczniak*, 428 Pa. 7, 235 A.2d 345 (1967) (award excessive); *Durante v. Alba*, 266 Pa. 444, 109 A. 796 (1920) (action in trespass—lower court applied incorrect standard); *Mindlin v. O'Boyle*, 278 Pa. 212, 122 A. 294 (1923) (action in assumpsit—lower court applied incorrect standard); *Lininger v. Kromer*, 238 Pa.Super. 259, 358 A.2d 89 (1976) (award inadequate); *Whitehill v. Schwartz*, 27 Pa.Super. 526 (1905) (record too vague to ascertain composition of award). To hasten the ultimate disposition of such cases, our appellate courts, under certain circumstances, have remanded for a trial limited to the issue of damages. In *Troncatti*, supra, 428 Pa. at 9, 235 A.2d at 346, our Supreme Court stated:

**8.** In a related contention, appellant alleges that in refusing to allow Mr. Perzak, a carpet specialist, to remove and resize the carpets on the day before trial, appellees breached their duty to mitigate their damages and, therefore, should be barred from recovery. The lower court correctly stated the rule of law governing this contention: "The concept of mitigation never requires an unreasonable act." *See also Gambale v. Allstate Ins. Co.*, 209 Pa.Super. 330, 228 A.2d 58 (1967); *Hilscher v. Ickinger*, 194 Pa.Super. 237, 166 A.2d 678 (1960); *Emporium Area Joint School Authority v. Amundson Const. and Bldg. Supply Co.*, 191 Pa.Super. 372, 156 A.2d 554 (1959), rev'd on other grds., 402 Pa. 81, 166 A.2d 269 (1960). In applying this principle to the instant case, the court stated: "The defendant had already caused additional damage when it attempted to resize the carpeting, which had shrunk as a result of the normal cleaning. It was only after this second attempt to repair the carpeting that the plaintiffs were informed by defendant that it never had the expertise or equipment to resize the rugs. . . . A reasonable man would never permit a second attempt under these circumstances, particularly when the offer to resize the rugs was made years after the damage was done and within days of trial of the matter." We agree, and, consequently, reject this contention.

"The granting of a new trial limited to the issue of damages was not permissible under the common law. (citations omitted). However, in the interest of justice and in order to expedite the final disposition of litigation, Pennsylvania and most other jurisdictions have wisely adopted a rule permitting such limited new trials . . . ." A new trial limited to the issue of damages is appropriate "only where (1) the question of liability is not intertwined with the question of damages, *and* (2) the issue of liability is either (a) not contested or (b) has been fairly determined so that no substantial complaint can be made with respect thereto." *Gagliano v. Ditzler*, 437 Pa. 230, 233, 263 A.2d 319, 320 (1970). See also *Troncatti*, supra; *Lininger v. Kromer*, supra; *Lambert v. P B I Industries*, 244 Pa.Super. 118, 137, 366 A.2d 944, 955 (1976).

In applying this test to the instant case, we note that nothing in the lower court's opinion indicates that the verdict in this non-jury case represented a compromise of the liability and damages issues or that these issues are in any way inextricably intertwined. *Lininger v. Kromer*, supra, 238 Pa.Super. at 273–275, 358 A.2d at 96–97; *Lambert v. P B I Industries*, supra. Next, we must determine whether the lower court fairly determined liability. *Troncatti*, supra, is helpful in making this determination. In *Troncatti*, appellant contended that the verdict was against the weight of the evidence and that the damage award was excessive. Because the Court held that the challenge to liability was meritless and because appellant asserted no trial errors which may have affected the liability issue, the Supreme Court concluded that liability had been fairly determined by the lower court.[9]

9. In reaching the same conclusion, our Court, in *Lambert v. P B I Industries*, supra, 244 Pa.Super. at 142, 366 A.2d at 956, said: "The fact that reasonable men could differ concerning the liability issue does not preclude the granting of a limited new trial under the present circumstances, where there is no basis for a conclusion that the liability issue was not fairly tried. Although the issue of liability was and is vigorously contested in this controversy, there are no errors of record which might have affected the jury's verdict on liability. . . ., and P B I has not established the existence of a

In the instant case, appellant raises the same contention as in *Troncatti*. Having already concluded that appellant's challenge to the lower court's finding of liability is meritless and because appellant does not allege trial errors which may have affected the liability issues,[10] we hold, as did the Supreme Court in *Troncatti*, that the lower court fairly determined issue of liability on competent evidence. *Contrast Gagliano v. Ditzler*, supra; *Diesel v. Caputo*, 244 Pa.Super. 195, 366 A.2d 1259 (1976).

Accordingly, because the lower court fairly determined the liability issue and because the issues of liability and damages are separable, we hold that a remand for a new trial limited to the issue of damages is mandated. At this hearing, the lower court should consider all evidence relevant to the determination of the value of the carpets at the time of the cleaning, including their purchase price in 1970, the condition of the carpets in 1974, an appropriate depreciation factor, and the salvage value, if any, of the carpets.

Case remanded for proceedings consistent with this opinion.

PRICE, J., did not participate in the consideration or decision of this case.

substantial complaint with regard thereto. . . . The respective parties have had a fair opportunity to present their respective positions on liability and the jury has clearly resolved that issue against appellant P B I and in favor of plaintiff." (Citations omitted).

10. The only contention raised by appellant which could be construed as a trial error concerns the lower court's alleged refusal to listen to counsel's explanations at trial in support of an objection and "motion to non-pros". Nowhere does appellant allege what explanations or arguments he would have offered which might have affected the outcome of the instant case. In short, this contention is frivolous and does not alter our determination that the lower court fairly determined the issue of liability.